## NATHANIEL A. WALCOTT
### *v.*
## JOHN H. HANAFORD.

---

San Juan, Equity, No. 212.

Bill for an accounting. See opinion for facts showing verbal partnership and right to an accounting.

Opinion filed March 20, 1907.

---

*J. F. P. des Garennes, Esq.,* solicitor for plaintiff.

*Joseph Anderson, Jr., Esq.,* solicitor for defendant.

RODEY, Judge, delivered the following opinion:

The parties are citizens of the United States. Complainant filed his bill October 5, 1903, alleging a partnership with respondent and stating its details, and praying for an accounting

between the parties in the usual manner. A large amount of unnecessary, and what appears to the court, after an examination of it, to be dilatory and frivolous pleading, occurred in the case during more than three years thereafter before coming to an issue.

The answer admits the partnership, but denies that respondent was to furnish any money in connection therewith, and alleges that, although he was to share equally in the profits, he was not to be liable for any losses, save out of the profits, and that a certain contract he had with one Pedro Zorilla, which he turned over to the partnership, was his contribution thereto, and that if he did furnish any money to the concern, he was to be allowed 6 per cent per annum on it, and that he did so furnish a large amount of money. He admits that there was no time fixed for the partnership to continue, and, in a general way, avoids every other allegation of the bill and sets up the fact of sending a lot of remittances from Boston to San Juan to pay for cigars received, etc., etc., and denies that he owes anything at all to the complainant, and denies selling out the entire business without the consent or knowledge of the complainant, and asserts that he gave him full information in that behalf.

On the 18th day of March, 1907, the cause came on for trial before the court, in open session, without the intervention of an examiner or master, the parties being duly represented, when a complete trial and accounting were had in the premises. The oral evidence was all noted by the court stenographer, but is not written out, as it is too voluminous, and, the matter being so fresh in the mind of the court, the findings of fact and law are made without the necessity of such transcript, as the stenographer has read to the court such portions of the evidence

Walcott v. Hanaford.

as there is any doubt about. The books and correspondence of the parties were brought into court for its inspection, and, in addition, a very large amount of communications in the way of letters between the parties was submitted. Both the complainant and respondent were examined by counsel and the court at length, and other witnesses were introduced in the premises; also a couple of expert bookkeepers, who had previously been over the books, testified for the information of the court, so that we feel we are thoroughly informed with reference to the facts and the rights of the parties. The following is a statement of the essential facts in the case, and an argument and findings based on the same:

The complainant had been in the furniture business at Portsmouth, New Hampshire, previous to 1901, and the respondent was a traveling man at that time in that vicinity. In this manner they became acquainted. Shortly afterwards, the respondent, in the course of events, came to Porto Rico and got employment as an internal revenue agent on the island, located at Vega Baja, but kept up communication with complainant. Shortly afterwards, complainant, probably from accounts of Porto Rico received from respondent, came to the island as his guest. After remaining here some weeks, the parties had some talk about engaging in the commission business; that is, to bring goods from the States to Porto Rico, and *vice versa.* At first, respondent was rather reluctant about entering the business, seeming to think that other partners engaged in other enterprises on the island with him ought to have the privilege of engaging in any new business with him, rather than the complainant. They made a trip to the States together, and after respondent saw his partners there and they declined to enter the new business, negotiations were again opened between

these parties at the city of Boston or its vicinity, where it appears the homes of both are. They finally agreed to commence a commission business. The partnership agreement was entirely verbal, no written articles ever having been entered into and no definite time for its duration having been fixed.

Complainant claims that the primary capital was to be $1,500 on the part of each, that they were to share equally in the profits or losses, and each to give his time, or as much thereof as might be necessary, to the affairs of the concern. Complainant supports his statement that the capital was to be equal, by letters from respondent and by the evidence of one Dr. Codding, who was one of the partners engaged in other enterprises with respondent. Respondent was acquainted in the island previous to complainant's coming from the States, with a cigar manufacturer named Zorilla, and, on the trip to the States, took some samples of this man's cigars with him with a view to introducing the goods to the trade. Respondent claims that he had a definite contract with this cigar manufacturer to handle his whole product, which was considered as a valuable asset, and that in consideration of this fact and of the fact that respondent spoke some Spanish, complainant had agreed to furnish all the capital for the enterprise and that the respondent should not be required to furnish any. This latter statement complainant emphatically denies.

They proceeded to business and it developed in its course that little or no business was done, save the handling of these cigars. Between four and five hundred gallons of bay rum were bought in Porto Rico and shipped to the States, and something like a hundred dozen ladies' belts were also purchased here and sent North. The parties opened an office in Boston, of which, by agreement, respondent took charge, and another office in San

Juan, Porto Rico, of which complainant took charge. A large quantity of these cigars was manufactured and shipped to Boston, where respondent received them, and, with the aid of his brother, who had been engaged as salesman and clerk, were sold to the trade largely through commission men, to whom 10 per cent was paid for their trouble. Several trips were made to the island by respondent from Boston, and by complainant to the States from San Juan. The business continued from about the fall of 1901 to the summer of 1902, and then dragged along until about June, 1903, when it finally ceased so far as active business was concerned. Towards the end of the active portion of the business, quite a large stock of cigars remained on hand in the customhouse at New York, as respondent claims, but complainant did not know whether they were there or in respondent's custody at Boston.

Some trouble arose during the conduct of the business, owing to the fact that there had been some sort of an agreement to take not more than about 60,000 cigars per month from this manufacturer, but the latter kept increasing the quantity month per month, sometimes delivering as high as 180,000 cigars in a single month. As this firm was his sole source of sale, he had to have large weekly amounts of cash to pay his help, and the procuring of which shortly began to embarrass the firm and necessitated a whole lot of cabling from San Juan to Boston, week per week, for money to pay him. The expenses of the firm ran heavy on account of this expense of cabling and on account of the difficulty in placing the goods in and around Boston, and the heavy commissions paid to agents, as well as the heavy expense of trips to and from the States by the respective parties, and because this manufacturer kept sending

in too many high-priced cigars, and not enough of cheaper grades.

Two sets of books were kept, one at the San Juan end by complainant and the other at the Boston end by respondent, the latter's brother being the bookkeeper there. The books at the San Juan end appear to have been honestly and correctly kept. The same, under the evidence, cannot be said with certainty for the Boston end.

Each of the partners, within two or three months after beginning business, had furnished considerable capital to the same. The complainant had his $1,500 in the concern in a short time, and the respondent also had that amount in it some time later. At the final examination of the books, it was found that the complainant had altogether furnished the sum of $843.35 to the capital stock in excess of the sum contributed by respondent; and further, was entitled to a credit of $410 as against respondent, making a total of $1,253.35, which he is entitled to out of the assets, if any.

The Boston books contain many items of expense that are arbitrary in the manner they are entered, not showing what they were used for, save that it was "expense," but respondent claims they were all legitimate.

In about July, 1903, after respondent's brother, the clerk at Boston, had written a letter to complainant at San Juan, telling him he had better come to Boston and look after his affairs, as his brother was not attending to business properly, complainant at once went to the States, and, when he got there, found that respondent had left for San Juan. He therefore returned shortly thereafter and met him here. Complainant claims that during the conversation which then took place, respondent told him that he had some $1,200 in cash on hand,

belonging to the firm, and would give him $600 of it, and that should end matters between them. Complainant states that at this time respondent told him nothing with reference to the business at Boston, when, as it afterwards developed, the latter had at that time, without notice to complainant, given over the entire stock of goods on hand in Boston to this brother, who was without means, for the latter's notes, and sold him the entire stock of cigars on hand, amounting to something over a hundred thousand, as well as the office furniture, for an alleged amount of $1,850.

After the bringing of this suit, counsel for complainant called on counsel for respondent and asked for the Boston books, which were delivered to him. Complainant's counsel and himself, as well as an expert, proceeded to examine the books, and after having worked on the same, off and on, for three or four weeks, respondent demanded the books back, as he needed them. They were delivered to him, as complainant testifies, for a few days, but when complainant went after them again he could only obtain his own San Juan books, and the others were not thereafter delivered to complainant's side of the case until two or three days before the beginning of this trial. On getting possession of the books again, complainant proceeded to re-examine them with the same expert that had helped his side to examine them three years ago, and he found that in the account of respondent and the account of the clerk, his brother, there had been many changes, erasures, and additions made. A great deal of conflict of evidence occurred over this. Complainant claimed, and in this he was supported by the expert, that the books had been changed since they first saw them, and erasures made so as to affect the relative rights of the parties. Respondent emphatically denied this. The court examined

Walcott v. Hanaford.

both parties and their witnesses at length on this subject and examined the books and the claimed erasures thereon, and unhesitatingly states that it is true, and so finds the fact to be. They were so altered and changed.

It appears that complainant, on one of his trips to San Juan, borrowed money from his father to pay his expenses, and about the time that the business ended, in the early part of the summer of 1903, sent a draft on the firm to his father, and a check also against the firm's funds in the bank, each for $175, with a view to having his father collect that amount from the firm. Respondent claims that about this time they had a lot of cigars in customhouse bond at New York, and the year within which they were permitted to lie there was about up and they had to be taken out, and that he had sent the firm's check for some $280 to New York for that purpose, and that therefore, when complainant's father presented these two $175 orders for cash, the check was paid at the bank and the draft was accepted, but not paid, as there was a three-day limit on it. That in the meantime he, respondent, stopped payment on it so as to leave the check sent to New York, good, because there were not funds enough in the bank to pay that check and these two $175 items called for by complainant through his check and order. Respondent states that he then feared that complainant was trying to take possession of the business and cash, and he at once took out the entire cash from the bank where it was and placed it in another bank where he had a private account, and then put some of his own cash with it, wired to New York and got back the check which he had sent there, and sent a new one on his own bank to pay the amount due, and got the cigars out of bond.

Respondent further testifies that he then at once made this sale to his brother, who had a small cigar stand in the Colonial

Walcott v. Hanaford.

'building in Boston, and that thereafter his brother paid all but a small portion of one of his notes, which amounted to $850, and still owes the other thousand dollars for the something more than a hundred thousand cigars which he sold. him.

Respondent also testified that complainant did not properly manage the San Juan end of the business, and permitted the cigar manufacturer on the island to send very few of a cheap grade of cigars, which were the best sellers and the most profitable, and, instead, to send large quantities of an expensive kind which were not profitable and which, in fact, could not be sold at all, and that the large supply on hand at the end of active business was composed almost entirely of these expensive kinds.

Considerable evidence was introduced in the case by both sides about this sale by respondent to his brother, and from it, the court unhesitatingly states that the whole transaction with the brother as to the final sale of these cigars is tainted with legal fraud and collusion, as against the rights of the complainant and the partnership, and therefore discards the same and holds respondent liable to the partnership for the value of the quantity of cigars which the evidence of the experts shows to have been on hand, or that ought to have been on hand, at the end of active transactions between the parties. The court also holds that it is impossible to state exactly what the legitimate expenses that could be charged against the partnership at the Boston end were, but is satisfied that some of the charges against the partnership were at least not necessary, and that therefore the respondent has probably obtained advantage in that regard.

We therefore feel constrained to hold, and do hold and find, that the partners had exactly equal rights, and were, under their agreement, to furnish equal capital in the premises, and

Walcott v. Hanaford.

therefore the profits and losses must be shared equally, and respondent is not entitled to have his capital back, with interest thereon, as he has claimed; and we find that the following statement made by the expert who examined the books and testified in the cause shows the true relation between the parties, and shows the amount complainant can claim from respondent, counting the goods at cost value:

Excess contributions from complainant, $ 843.35

    Add $240 erroneously charged to com-
       plainant personally in San Juan,
       less $75 charged to expense in Bos-
       ton, ....................... 165.00

Add difference between amount
    charged by respondent to expense
    on weekly items of $485 and $240
    received, .................... 245.00

                                    $1,253.35

Value at cost price of sale
  of cigars to respondent's
  brother, ............. $2,767.75
Less above amount first
  due complainant, ...... 1,253.35

                $1,514.40

One half due complainant .................... 757.20
One half of cash on hand, ($143.50) ............ 71.75
One half accounts receivable, afterwards collected,
  ($174.50) ................................. 87.25

                          $2,169.55

We therefore find that the complainant is entitled to recover

of and from the respondent, on the equities between them, the sum of $2,169.55, together with his costs in this behalf laid out and expended, and that he have execution therefor. A proper decree will be entered accordingly in the premises.